No. 22-30456

———————————

# United States Court of Appeals
# for the Fifth Circuit

———————————

**TELIAH C. PERKINS, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF D.J., A MINOR,**

*Plaintiff – Appellee*

v.

**KYLE HART; RYAN MORING,**

*Defendants – Appellants*

———————————

**On Interlocutory Appeal from the United States District Court, Eastern District of Louisiana, No. 2:21-cv-00879, Honorable Wendy B. Vitter, Presiding**

———————————

**PETITION FOR PANEL REHEARING**

———————————

**Chadwick W. Collings (La. Bar. No. 25373)**
**Sarah A. Fisher (La. Bar No. 39881)**
**MILLING BENSON WOODWARD L.L.P.**
**68031 Capital Trace Row**
**Mandeville, LA 70471**
**985-292-2000**
ccollings@millinglaw.com
*Counsel for Kyle Hart and Ryan Morning*

## INTRODUCTION

On November 30, 2023, this Court issued a decision in this case, dismissing in part, reversing and rendering in part, and remanding for further proceedings (copy of opinion attached).   Pursuant to <u>Federal Rule of Appellate Procedure 40</u>, Appellants now file this Petition for Panel Rehearing, respectfully requesting that this Court reconsider its decision regarding Plaintiff-Appellee's First Amendment claim. Appellants respectfully assert that the panel overlooked material facts in concluding that the District Court was correct in denying Appellant's motion for summary judgement. Specifically, this Court overlooked material facts as they relate to Defendant-Appellant, Officer Moring's, attempts to establish a reasonable perimeter around an active arrest.

## FACTS AND BACKGROUND

This matter came before this Court on interlocutory appeal from an Order of the United States District Court for the Eastern District of Louisiana filed on July 26, 2022, denying a *Motion for Summary Judgement* filed by Deputies Kyle Hart and Ryan Moring, Defendants-Appellants. <u>ROA 1903-134</u>.

Defendant-Appellants are St. Tammany Parish Sheriff Deputies sued on May 3, 2021, by Plaintiff-Appellee, Teliah Perkins, both individually and as parent and natural guardian of D.J., a minor. <u>ROA 11-47</u>. Plaintiff's suit arose from an encounter with Defendants on May 5, 2020, at Ms. Perkins' residence in Slidell, Louisiana.

2

Defendants filed their *Answer and Affirmative Defenses* on August 3, 2021, in which they affirmatively plead Qualified Immunity. ROA 122-146. On February 6, 2022, Defendants jointly moved for summary judgment, asserting that they could not be liable for the claims alleged and that there was no genuine issue of material fact in that respect. ROA.203-27. Indeed, there was recorded video footage entered into evidence that explicitly showed the events in question, leaving no genuine issues of material fact to reasonably dispute. Thus, Defendants argued that (i) there were no Constitutional or statutory violations in light of the uncontested material facts; and (ii) regardless, they were entitled to Qualified Immunity. ROA.203–46.

Plaintiffs' Opposition to Defendants' *Motion for Summary Judgment* (ROA.369–401) conceded that Perkins' § 1983 claim for false arrest and parallel state law claims for false arrest, false imprisonment, and malicious prosecution were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), as argued by Defendants. ROA.213-17. The district court acknowledged this concession in its Trial Preparations and Procedures Order. ROA.1016-20. On July 26, 2022, however, the district court filed an Order denying Defendants' *Motion for Summary Judgment* on all but one claim.[1]

---

[1]    Defendants were granted partial summary judgment under La. R.S. 32:863 on Plaintiffs' "unlawful seizure" claim for the impounded motorcycle. The court concluded that Defendants were entitled to Qualified Immunity on that claim due to Plaintiff's failure to provide proof of liability insurance upon request. ROA.1129-32.

3

In the Order filed on November 30, 2023, this Court reversed the District Court's denial of summary judgement, finding that both Officer Hart and Officer Moring were entitled to qualified immunity as a matter of law on both Plaintiff and her minor son's excessive force claims.

The Court, however, affirmed the Eastern District's decision denying Deputy Moring qualified immunity, and therefore summary judgment, as to D.J.'s First Amendment claim. Appellants now seek panel rehearing as to the affirmation of the District Court's decision as to D.J.'s First Amendment claim.

## ARGUMENT

Panel rehearing is appropriate where the Court has "overlooked or misapprehended" a point of law or fact. Fed R. App. P. 40(a)(2). Under this Court's local rules, "[a] petition for rehearing is intended to bring to the attention of the panel claimed errors of fact or law in the opinion." Fifth Cir. Loc. R. 40.2. The Court may, after granting rehearing, "make a final disposition of the case without reargument." Fed. R. App. P. 40(a)(4). Appellants request that this Court grant this petition for panel rehearing and if the panel sees fit, allow re-argument on Plaintiff-Appellee's First Amendment Claim. Appellants seek a final disposition that reverses the Eastern District's denial of summary judgement as to Appellee's First Amendment claim.

While this Court properly reversed the District Court's decision denying the Officers qualified immunity on Plaintiff-Appellee's excessive force claims, the issue

which the Court did not reverse involves whether Appellee's minor child's First Amendment rights were violated when Officer Moring attempted to secure the perimeter of an active arrest. The Court's decision to remand this issue overlooked material facts and was an erroneous application of law. As such, this issue requires rehearing.

### A. Material Facts at Issue

The key, fatal fact overlooked in this matter is that D.J. was never asked or forced to cease filming his mother's arrest, and thus, there can be no First Amendment violation under the circumstances of this case. More importantly, the facts supporting this position are evident from the record, as shown by the video recording of the incident entered into evidence and by Officer Moring's supporting affidavit. D.J was asked to back up repeatedly and was instructed that he could continue filming the encounter from the porch of the residence right behind him, which was a sufficient distance from the spot of the arrest – all to help ensure a safe and effective perimeter. Never once was D.J.'s right to record hindered – his video angle was merely blocked momentarily in a reasonable effort to secure the scene of an active arrest.

Respectfully, the Court's decision to remand this issue was based on entirely misconstrued facts, which are beyond debate given the recorded video of the encounter. Specifically, the Court improperly determined that Officer Moring's

actions were sufficient to cause D.J. to "suffer an injury that would chill a person of ordinary firmness from continuing to engage in [a Constitutionally protected] activity," citing *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). However, contrary to the language of this Court's Order, D.J.'s "exercise of free speech" was in no way curtailed. He was merely asked to back up, and when he repeatedly refused to do so, he was met with a show of non-lethal force to induce compliance. The fact that D.J. may not have been engaged in illegal activity is wholly immaterial.

While both the district court and this Court relied on Officer Moring's deposition testimony, in which he admitted he intentionally stood in front of D.J. and blocked him from recording Perkins's arrest, this ignores the fact that Morning's momentary action was done for the purpose of creating space and ensuring officer safety. Moreover, the clear video footage negates any reasonable argument that Officer Morning's actions were somehow motivated against D.J.'s exercise of constitutionally protected conduct, rather than being motivated by the need to establish a reasonable perimeter around an active, violent arrest. For these reasons, Defendant-Appellants respectfully submit that Plaintiff-Appellees cannot satisfy the second and third elements of D.J.'s First Amendment retaliation claim against Officer Moring. Defendant-Appellants request rehearing on this issue.

**B. Applicable Law**

The Court's present holding also improperly distinguishes Circuit precedent set forth in *Buehler v. Dear*, 27 F.4th 969 (5th Cir. 2022). In *Buehler*, nine police officers were sued in a § 1983 action for alleged false arrest, First Amendment retaliation, and Fourth Amendment excessive force after detaining a man for resisting arrest in Austin, Texas. Officers were patrolling the streets of downtown Austin when Antonio Buehler, a "police accountability activist," began standing too close to the officers to video-record their activities. *Id*. at 976. Buehler was given multiple warnings by the police to heed their instructions to maintain a sufficient distance while filming and was further warned that he would be arrested if he did not comply. *Id*. After nearly two minutes passed and upon Buehler's failure to comply with police instruction, one of the officers stated, "Go ahead and turn around…You're under arrest." *Id*.

While this instruction was being given, Buehler began taking steps backward away from the officers as they walked toward Buehler to arrest him. *Id*. Buehler then turned his back on the officers to proceed away from them when one of the officers grabbed Buehler's wrists from behind and attempted to restrain him. *Id*. Three Austin police officers took Buehler to the ground and held him in a prone position while placing him in handcuffs, with Buehler suffering minor bruises and lesions as a

result.[2] *Id*. at 978. A fourth officer approached and assisted in the arrest by holding Buehler's legs still. *Id*. Buehler remained on the ground for between 40 to 45 seconds and was arrested for misdemeanor interference with performance of official duties and resisting arrest.[3] *Id*. In addition to the minor abrasions, Buehler claimed to have suffered mental pain. *Id*. The incident was video recorded from multiple angles. *Id*.

The officers moved for summary judgment on Buehler's false arrest and excessive force claims based on Qualified Immunity. *Id*. at 978-79. The district court granted the officers' motion as to false arrest but denied the motion as to excessive force. *Id*. at 977. On interlocutory appeal, this Court concluded that summary judgment for the officers on Buehler's false arrest claim was proper and that the officers were entitled to Qualified Immunity on Buehler's First Amendment claim. *Id*. This Court also found that none of the officers involved in Buehler's arrest used excessive force in violation of the Fourth Amendment and, thus, reversed the district court's denial of summary judgment on that claim. *Id*. at 994.

On appeal in *Buehler*, this Court noted that the issue presented was simply "whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary

---

[2]     The procedure followed by the officers in *Buehler* is the same procedure followed by Defendants. ROA.286, 303-04. ("Plaintiff is again seen pulling her arms away from the Defendants and kicking her legs. The Defendants then place Plaintiff prone on her stomach and Deputy Hart kneels on the back of her legs as she is handcuffed.") ROA.1116-117.

[3]     Teliah Perkins was on ground for 1:15 minutes due to her own active resistance. ROA.334.

judgment." *Id*. at 979, citing *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir, 2004).

The Court also noted the significance for purposes of appellate review that the record

included video evidence of the arrest. *Id*. This Court stated, "[w]e 'must measure the

force used under the facts as a reasonable officer *would perceive them*…' [a]nd we

have acknowledged that…a 'suspect who backs away from the arresting officers' is

'actively resisting arrest' – albeit mildly." *Id*. at 984. (citations omitted). The Court

further held that the officers were entitled to Qualified Immunity based on their

"measured and ascending" response to Buehler's noncompliance, noting that while

Buehler's conduct may not have been "erratic," he relentlessly disobeyed the

officers' unambiguous commands, thus, their measured and ascending response did

not violate the Fourth Amendment. *Id*. at 984-85.

In the present case, the Court improperly distinguishes *Buehler* from the facts

at hand. In its Order, this Court stated that *Buehler* was easily distinguishable from

the case at hand, seemingly because the Plaintiff in *Buehler* was more disruptive

than in the case at hand. Appellants submit that this analysis is amiss, as there is no

sliding scale reference in the law regarding the degree of disruption or potential harm

an individual can pose relative to an officer's right to secure a safe perimeter. In

addition, the fact that D.J. was acting "on his family's private property" is

immaterial. Just feet away, on this same private property, his mother was resisting

arrest by flailing in the driveway and creating an increasingly uncertain situation for the Officers. Both D.J. and his mother were hostile and uncooperative.

Indeed, as Justice Ho's dissent notes, "Moring understandably ask[ed] D.J. to back up. Yet despite Moring's repeated requests… D.J. repeatedly, and with increasing intensity, shout[ed] that he refuse[d] to move." Doc. 72-1, p. 17 (dissent).

Again, this Court erred in another conclusion of law via misinterpretation of fact when it stated that Officer Moring substantially interfered with D.J.'s exercise of his First Amendment rights when Moring intentionally blocked D.J. from filming the interaction. This is an erroneous conclusion of law that is the result of a misinterpretation of the facts. Appellant here emphasizes the dissent's position that "*the Constitution does not compel police officers to affirmatively help a citizen secure the ideal camera angle while that citizen is actively berating the police just a few feet away from an active physical struggle with another person*." The dissent is able to correctly reach this conclusion because they recognize the fact that Moring did not interfere with D.J.'s right to video the interaction. Indeed, "Officer Moring's affidavit states that, far from trying to interfere with anyone's right to record, he specifically affirmed that D.J. could 'film from the porch of the residence.'"

## CONCLUSION

Thus, it is clear that the panel misinterpreted both the relevant law and the applicable facts in this case. As such, Defendant-Appellants respectfully request that

this Court grant this Petition for Panel Rehearing and issue a final disposition that reverses the Eastern District's denial of summary judgement as to Appellee's First Amendment claim. Appellants also request that this Court allow re-argument on Plaintiff's First Amendment claim.

<div align="center">

Respectfully submitted,

MILLING BENSON WOODWARD L.L.P.

</div>

*s/ Sarah A. Fisher*
_____
**Chadwick W. Collings, T.A. (La. Bar. No. 25373)**
**Sarah A. Fisher (La. Bar No. 39881)**
**68031 Capital Trace Row**
**Mandeville, LA 70471**
**Telephone:  (985) 292-2000**
**Facsimile:   (985) 292-2001**
**Email:       ccollings@millinglaw.com**
***Counsel for Kyle Hart and Ryan Moring***

## CERTIFICATE OF SERVICE

Pursuant to FED. R. APP. 25, undersigned counsel certifies that a copy of the foregoing has been served upon counsel of record for all parties, via electronic mail, at the following addresses:

| | |
|---|---|
| Stephanie Legros Willis, Esq.: | swillis@laaclu.org |
| Nora Sam Ahmed, Esq.: | nahmed@laaclu.org |
| Keith Cohan, Esq.: | kcohan@reidcollins.com |
| Ryan Mitchell Goldstein, Esq.: | rgoldstein@reidcollins.com |
| Sean David Johnson, Esq.: | sjohnson@reidcollins.com |
| Vincenzo A. Novelli, Esq.: | vnovelli@reidcollins.com |

on this, the 14th day of December, 2023, the date of electronic filing. All counsel of record are also this day receiving service of the foregoing via the Court's ECF system. Hard copies will be sent via U.S. Mail to all counsel of record after the electronic filing is accepted by the Clerk of Court.

_s/ Sarah A. Fisher_

**Sarah A. Fisher**

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 40(b), that the attached PETITION FOR PANEL REHEARING:

(1) Contains 2170 words; and

(2) Complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Word 2016, in 14-point Times New Roman font.

<div align="center" style="margin-left:auto">

**Respectfully submitted,**

**MILLING BENSON WOODWARD L.L.P.**

*s/ Sarah A. Fisher*
**Chadwick W. Collings, T.A. (La. Bar. No. 25373)**
**Sarah A. Fisher (La. Bar No. 39881)**
**68031 Capital Trace Row**
**Mandeville, LA 70471**
**Telephone: (985) 292-2000**
**Facsimile: (985) 292-2001**
**Email: ccollings@millinglaw.com**
***Counsel for Kyle Hart and Ryan Moring***

</div>

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 30, 2023

Lyle W. Cayce
Clerk

————————

No. 22-30456

————————

Teliah C. Perkins, *individually and as parent and natural guardian of D.J., a minor,*

*Plaintiff—Appellee,*

*versus*

Kyle Hart; Ryan Moring,

*Defendants—Appellants.*

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-879

———————————————————

Before Elrod, Ho, and Wilson, *Circuit Judges.*

Per Curiam:[*]

Teliah C. Perkins was arrested by two St. Tammany Parish Sheriff's Deputies, Kyle Hart and Ryan Moring, after the Deputies responded to reports of a person driving a dirt bike recklessly and without a helmet. The Deputies approached Perkins in her driveway and asked for her license, registration, and proof of insurance. The situation escalated quickly. The

————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-30456

Deputies initiated an arrest; Perkins resisted but was eventually taken to the ground and handcuffed. Perkins's minor son D.J. and her nephew recorded the altercation with their cell phones. At one point, the videos briefly show Deputy Hart's hand on Perkins's throat as he struggled to get up off the ground. Perkins sued, alleging claims of excessive force used against her and D.J. She also alleged a First Amendment retaliation claim on behalf of D.J.

The Deputies moved for summary judgment, raising qualified immunity as a defense to the claims. The district court largely denied the Deputies' motion. On appeal, we dismiss in part, reverse and render in part, and remand for further proceedings.

## I.

### A.

Perkins is a resident of Slidell, Louisiana.[1] On May 5, 2020, she observed the Deputies riding down the street on police motorcycles. The Deputies turned their motorcycles around, drove to her driveway, and shouted for her to come to them. The Deputies asked for her driver's license, registration, and proof of insurance, as they were investigating a complaint about a female recklessly riding a dirt bike without a helmet. Perkins mostly complied with those requests but was unable to produce proof of insurance.

After asking if the inquiry was racially motivated, Perkins became frustrated and non-compliant. She called 911 to request a supervising officer and asked her son and nephew to record the encounter with their cell phones.

———————————————

[1] These facts are recounted in the light most favorable to Perkins, as she is the non-moving party, *see Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009), save for facts drawn conclusively from the videos, *see Scott v. Harris*, 550 U.S. 372, 381 (2007).

The Deputies instructed the boys to return to the porch. D.J. and the nephew both filmed the ensuing altercation.[2]

When Perkins continued to act belligerently and refuse to comply with their requests, the Deputies attempted to place her under arrest. They seized her arms, forced her to the ground, muttered that she was "f—ing slippery," and then, according to Perkins, "leaned on [her] back and neck with their knees and elbows, pulled her hair, and forced her face against the driveway pavement while wrenching her arms behind her back." Perkins does not deny that she tried to pull her arms away. The Deputies repeatedly told her to "stop resisting" but she continued to flail her arms and legs and deny that she was resisting. She also repeatedly yelled at and taunted the Deputies— telling one, "I'm on the ground, you're so weak, boy." Eventually, she was successfully handcuffed by Deputy Hart.

At that point, Deputy Moring stood up and turned his attention to the boys, while Hart continued to struggle with Perkins on the ground. Moring moved directly in front of D.J., blocking his camera's view of Perkins and Hart. He told D.J. to "get back" and might have pushed him. D.J. and Moring continued to quip at each other—"you can't touch me," "get back," and so on. Moring eventually held a taser out toward D.J. to keep him at bay, and they then sniped about whether Moring could properly do so.

Meanwhile, on the ground, Hart kept pressure on Perkins's back for about a minute to keep her subdued. As soon as Hart released the pressure, however, Perkins flipped onto her back and began kicking and struggling with Hart again. At that point, Hart placed his hand on Perkins's shoulder to

---

[2] There is a third video in the record taken by a neighbor, but it does not provide any additional insight. We note, too, that the nephew's video was altered and fast-forwards through various moments during the fracas.

control her, or to try to get up. His hand then slipped onto Perkins's neck for less than two seconds, and Perkins yelled "you're choking me!" Her nephew then yelled "y'all are choking a lady." All this time, Moring's back was turned, as he and D.J. interacted. Moments later, Hart and Perkins stood and walked toward the street. A neighbor told the boys to "go inside, go inside, please go inside." Perkins agreed, telling them to "go inside." Their videos then end.

The Deputies arrested Perkins for resisting a police officer with force or violence, battery of a police officer, no proof of insurance, and no safety helmet. She was detained overnight. The District Attorney's Office amended her bill of information to "R.S. 14:108 Resisting an Officer," for which she was tried and convicted.

## B.

Perkins sued the Deputies, asserting claims individually and on behalf of D.J. under 42 U.S.C. § 1983 for violations of their rights under the First, Fourth, and Fourteenth Amendments. The Deputies filed a motion for summary judgment, principally contending that they were entitled to qualified immunity.

The district court granted the motion as to Perkins's unlawful seizure claim but denied summary judgment as to all other claims. Weighing Perkins's excessive force claim, the district court dissected the videos of her arrest, specifically emphasizing the elbow pressure on her back, her cries of pain, and Deputy Hart's hands on Perkins's throat after she had been handcuffed. In light of "the minor nature of [Perkins's] crime and [the Deputies'] own admittance of that fact," the court "determine[d] that there [was] sufficient evidence that a jury could determine that the [Deputies'] actions during the arrest were disproportionate . . . ." Adopting the perspective of a reasonable officer on the scene, the court reasoned—again,

relying on the videos—that Perkins was pacing back and forth in her driveway when the arrest began and, while she resisted, there was "no evidence whatsoever that [Perkins] threatened the [Deputies] or made any reference to a weapon in her home." The district court acknowledged that Perkins admitted she initially resisted arrest, a fact confirmed by the videos. But the court explained that this circuit's "law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable." The court concluded that "a disputed issue of material fact exists regarding the amount of force used by Defendants while attempting to arrest Plaintiff and after she was handcuffed and subdued."

Turning to D.J.'s excessive force claim, the district court again marshalled through the evidence and concluded that Deputy Moring violated clearly established law and used excessive force. The court found that Moring had no justification to display and threaten to use his taser against D.J., a minor who was neither fleeing nor under arrest. Further, the court determined that D.J.'s filming of the incident was a lawful activity, so no non-retaliatory grounds justified Moring's interference with D.J.'s First Amendment rights. Thus, the court concluded that Moring's conduct violated D.J.'s clearly established First Amendment rights and was not "objectively reasonable in light of clearly established law."

The Deputies noticed this interlocutory appeal, challenging the district court's denial of qualified immunity.

## II.

"To determine whether a public official is entitled to qualified immunity, we decide '(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). "[A]n order denying

qualified immunity, to the extent it turns on an 'issue of law,' is immediately appealable." *Behrens v. Pelletier*, 516 U.S. 299, 311 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). Our interlocutory jurisdiction is limited, as the district court's finding that a genuine factual dispute exists is a determination that cannot be reviewed. *Id.* The district court's "determination that a particular dispute is material," however, "is a reviewable legal determination." *Id.*; *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc). Thus, we "ask only 'whether the factual disputes that the district court identified are material to the application of qualified immunity.'" *Kokesh v. Curlee*, 14 F.4th 382, 391 (5th Cir. 2021) (en banc) (quoting *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018)).

Within this limited jurisdiction, we "review de novo defendants' invocations of qualified immunity," but "accept all well-pleaded facts as true . . . and view all facts and inferences in the light most favorable to the nonmoving party." *Club Retro*, 568 F.3d at 194. However, "[w]hen a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'" *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 329–30 (5th Cir. 2020). That means "[t]he plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief." *Id.* at 330; *see also Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008). "[T]o overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330. We examine the actions of multiple defendants asserting qualified immunity individually. *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (citing *Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007)).

# III.

## A.

We begin with Perkins's claim of excessive force. "To prevail on an excessive-force claim, [a plaintiff] must show (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (alteration in original)). "[W]hether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2017)). We consider three factors to help make this determination: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Because the district court denied summary judgment to the Deputies "on the basis that genuine issues of material fact exist," it essentially "made two distinct legal conclusions: that there are 'genuine' issues of fact in dispute, and that these issues are 'material.'" *Reyes v. City of Richmond*, 287 F.3d 346, 350 (5th Cir. 2002). We cannot review the first conclusion, but we can the second. And while "we review the facts in the light most favorable to the non-moving party," "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Trammel v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017) (quoting *Hanks*, 853 F.3d at 743, 744.); *but see Edwards v. Oliver*, 31 F.4th 925, 930–31 (5th Cir. 2022) (declining to consider video evidence because the district court found that *the video itself* created a genuine factual dispute). Where the video evidence

No. 22-30456

is conclusive, we should thus "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

"An officer challenges materiality when he contends that 'taking *all* the plaintiff's factual allegations as true no violation of a clearly established right was shown.'" *Reyes*, 287 F.3d at 350 (quoting *Cantu v. Rocha*, 77 F.3d 795, 803 (5th Cir. 1996)). The Deputies argue that Perkins cannot meet her burden to overcome qualified immunity and the district court erred in holding otherwise, particularly because the court's conclusions were "contrary" to the evidence—the videos taken by Perkins's son and nephew. *See Edwards*, 31 F.4th at 930.[3] The Deputies contend that the video evidence so clearly exonerates their actions that a reasonable viewer has no choice but to conclude the district court erred. We agree that the video footage conclusively shows the Deputies' use of force was not "clearly unreasonable," *Hanks*, 853 F.3d at 744, under the circumstances.

We first analyze whether Moring is entitled to qualified immunity, then Hart. *See Solis*, 31 F.4th at 981 ("We examine each officer's actions independently to determine whether he is entitled to qualified immunity.").

1.

Analyzing the *Graham* factors, the district court determined there were genuine issues of fact as to whether Perkins suffered an injury during the altercation, whether her purported crime was severe, and whether she

---

[3] While the Deputies ostensibly challenge materiality, their brief repeatedly contests the district court's conclusion that genuine fact disputes exist. Thus, "despite giving lip service to the correct legal standard," much of the Deputies' argument improperly challenges *genuineness* rather than *materiality* of the fact disputes found by the district court. *Reyes*, 287 F.3d at 351. And the Deputies' briefing often "does not take the facts in a light most favorable to [Perkins]." *Id.* at 350. Those deficiencies aside, we assess the Deputies' arguments viewing the facts most favorably to Perkins except where the facts are otherwise conclusively established by the videos. *See Trammell*, 868 F.3d at 338.

posed a threat to the safety of the officers or others.  We cannot, and do not, question those conclusions.  *See Ramirez*, 716 F.3d at 373.  But the court also found that Perkins actively resisted the Deputies when they tried to arrest her—a fact the videos conclusively prove, and which proves conclusive in assessing whether the Deputies, particularly Deputy Moring, are entitled to immunity.

"'[A] suspect's refusal to comply with instructions' may indicate that physical force is justified . . . ."  *Joseph*, 981 F.3d at 332 (quoting *Deville*, 567 F.3d at 167–68); *see also Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 480 (5th Cir. 2021) ("Resisting while being handcuffed constitutes active resistance and justifies the use of at least some force.").  However, "[t]he timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive."  *Joseph*, 981 F.3d at 332.  "To stay within constitutional bounds, an officer must use force 'with measured and ascending actions that correspond[ ] to [a suspect's] escalating verbal and physical resistance.'"  *Id.* (alterations in original) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)).  Notably, "[f]orce must be reduced once a suspect has been subdued."  *Id.* at 335.

The videos demonstrate that Deputy Moring "stay[ed] within constitutional bounds."  *Id.* at 332.  Deputy Hart first approached Perkins and attempted to place her hands behind her back.  When she pulled away, Moring approached to assist, and both Deputies repeatedly warned Perkins not to resist.  Perkins then sat on the ground and refused to place her hands behind her back.  As both Deputies attempted to cuff Perkins, she continued to pull away and verbally antagonize them.  The Deputies eventually forced Perkins onto her stomach, after which Moring placed his elbow on her back while Hart attempted to place handcuffs on her.  Critically, as soon as Hart put the handcuffs on Perkins, Moring stood up and walked towards D.J.

No. 22-30456

Moring did not touch Perkins again. In other words, as soon as Perkins was subdued, Moring reduced the force he applied, to none at all. *See id.* at 335.

The district court's analysis of the summary judgment record up to that point is not problematic, as it aligns with the video evidence. And that evidence presents no material issue regarding the force either Deputy used in their efforts to cuff and subdue Perkins, who indisputably was resisting arrest. But the court thereafter erred by finding a genuine dispute of material fact regarding *both Deputies' conduct* based on Deputy Hart's actions after Perkins was cuffed—and after Deputy Moring stood up and engaged D.J. In other words, the district court impermissibly treated the Deputies in tandem, denying both of them qualified immunity because of Hart's alleged choking of Perkins, which the videos demonstrate Moring could not even see as it occurred. Assessing Deputy Moring's conduct individually, *Solis*, 31 F.4th at 981, there is no dispute that his use of force was proportional to Perkins's resistance, and there is no dispute he stopped using force once Perkins was subdued. Deputy Moring is therefore entitled to qualified immunity as a matter of law. *See Hutcheson*, 994 F.3d at 481.

**2.**

As for Deputy Hart, based on Perkins's version of events alone, the district court's denial of summary judgment to Hart could withstand scrutiny; she alleges Hart choked her, and Hart denies it—a classic dispute of material fact. However, when the evidence is "viewed in the light depicted by the videotape," *Scott*, 550 U.S. at 381, it is clear that Hart is also entitled to qualified immunity. The district court, focusing on Hart's alleged choking of Perkins, found a genuine dispute of material fact as to whether the Deputies' use of force was proportional to Perkins's resistance once she was handcuffed. In so doing, the court accepted Perkins's allegations that "she was choked twice." But the district court should not have adopted Perkins's

version of the facts because "no reasonable jury" could find that Hart choked Perkins based on the video. *See id.* at 380.

Picking up where we left off above, Perkins's nephew's video[4] shows that once Hart put the handcuffs on Perkins, Deputy Moring stood up and walked towards D.J. Meanwhile, Hart continued to struggle with Perkins on the ground. Because Moring was blocking D.J.'s and the nephew's camera angles, much of that struggle is obscured. But Hart kept pressure on Perkins's back for about a minute to subdue her. When Hart released the pressure, Perkins flipped onto her back and began kicking and struggling with Hart again. At that point, Hart placed his hand on Perkins's shoulder to bring her under control, or to try to get up. For two seconds, the nephew's video shows Hart's hand on Perkins's neck, and Perkins can be heard screaming, "why you choking me?" Moments later, Hart and Perkins stood up and walked toward the street. The video then ends.

"[V]iewed in the light depicted by the videotape," *id.* at 381, Hart's use of force was proportional to Perkins's resistance. He kept pressure on her back for less than a minute and then reduced his force. At that point, Perkins flipped onto her back and began kicking, i.e., resumed resisting Hart. As they struggled, Hart placed his hand on Perkins's shoulder, and it slipped for a couple seconds onto her neck. Perkins's exclamation about choking notwithstanding, the video shows no choke. And Hart's actions "correspond[ed] to [Perkins's] . . . physical resistance." *See Joseph*, 981 F.3d at 332–33. And the fact that Hart's hand was briefly at Perkins's neck does not constitute excessive force. *Cf. Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999) (finding that an officer's force was not excessive with respect to an

––––––––––––––––––––––

[4] As mentioned in note 2, there were three videos taken of the incident. But the nephew's video is the only one that shows the purported choking. D.J.'s video is blocked by Moring as the alleged choke occurred, and the neighbor's video does not show it either.

alleged choking that occurred while the officer attempted to search the plaintiff's mouth). The district court erred in basing its denial of summary judgment on Perkins's version of the facts, despite what the video footage shows. Deputy Hart is entitled to qualified immunity as a matter of law.

**B.**

Next, we turn to D.J.'s claim for excessive force. Such claims are governed by the Fourth Amendment, which protects the right to be free from excessive force during a seizure. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). "A violation of this right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph*, 981 F.3d at 332 (citing *Poole*, 691 F.3d at 628); *see Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009).

Here, our task is straightforward because there was simply no seizure from which an excessive force claim can stem. *See, e.g.*, *Brower v. Cnty. of Inyo*, 489 U.S. 593, 595 (1989) ("We reasoned that '[w]henever an officer restrains the freedom of a person to walk away, he has seized that person.'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (alteration in original))); *see also Graham*, 490 U.S. at 395 (explaining that excessive force cases stem from the course of an "arrest, investigatory stop, or other 'seizure' of a free citizen" and should be analyzed under the Fourth Amendment's reasonableness standard). At no point was D.J. prevented from leaving the scene—rather, he was repeatedly asked to do so, to "get back" and move away while Deputy Moring was securing the perimeter. True, he was prevented from further approaching Perkins and Deputy Hart, but that was the officers' prerogative to secure the scene and did not infringe on D.J.'s Fourth Amendment rights. *See United States v. Mendenhall*, 446 U.S. 544, 552–55 (1980) (collecting cases, including *Terry v. Ohio*, 392 U.S. 1 (1968),

delineating the difference between permissible police conduct furthering police duty and conduct that constitutes a seizure).

Thus, even accepting D.J.'s version of the facts as true, he cannot prevail on a claim of excessive force because there was no violation of his Fourth Amendment rights. *See Joseph*, 981 F.3d at 330; *Ontiveros*, 564 F.3d at 382. The district court erred in holding otherwise, and the Deputies are entitled to summary judgment as to this claim.

## C.

D.J.'s First Amendment retaliation claim against Deputy Moring fares better. To establish such a claim, D.J. must show (1) he was "engaged in constitutionally protected activity," (2) Moring's actions caused him to "suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) Moring's "adverse actions were substantially motivated against [D.J.'s] exercise of constitutionally protected conduct." *See Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). The district court determined D.J. satisfied all three prongs, as he was engaged in lawful activity—the filming of the arrest—and there were no non-retaliatory grounds to justify Moring's interference with D.J.'s First Amendment rights, particularly because D.J. was not engaged in any illegal activity. The district court relied on Moring's deposition testimony, in which he admitted he intentionally stood in front of D.J. and blocked him from recording Perkins's arrest.

As to the first element, in 2017, we clearly established that "a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions." *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017). While Moring acknowledges there is a constitutional right to film the police, he insists this case is different because

D.J. "exceed[ed] that right to the point of interference." He pegs his argument to our recent case, *Buehler v. Dear*, 27 F.4th 969 (5th Cir. 2022).

The *Buehler* court concluded there was not a clearly established right to record the police in 2015. *Id.* at 992. However, while *Buehler* was published after *Turner*, the events in *Buehler* happened well before *Turner* was decided. The *Buehler* court thus did not engage in further analysis because the officers were entitled to qualified immunity, as the First Amendment right had not been clearly established at the time of the officers' actions. Regardless, Moring latches on to *Buehler*'s opening statement—that there is a "line between filming the police, which is legal, and hindering the police, which is not." *Id.* at 976 (asking, but not answering, "How close is 'too close' such that the filming, however well-intentioned, becomes hazardous, diverting officers' attention and impeding their ability to perform their duties in fast-moving, highly charged situations?").

*Buehler* is easily distinguishable. There, the plaintiff was a police-accountability activist who was arrested on notoriously crowded Sixth Street in downtown Austin, Texas, while recording police activity. *Id.* (describing Buehler's actions as "cop watching"). He engaged in repeated verbal confrontations with police officers, pushing the boundaries of how close to them he was permitted to stand while recording. *Id.* Buehler was arrested for misdemeanor interference with performance of official duties after the bickering escalated between him and the police. *Id.* The situation here is fundamentally different. While D.J. was clearly close to the arrest scene—the perimeter of which was being secured by Moring—D.J. was not a hazard, was not too close, and did not impede the Deputies' ability to perform their duties. Indeed, the Deputies successfully handcuffed Perkins despite D.J.'s presence and active recording.

As we explained in *Turner*, "[f]ilming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." 848 F.3d at 689. Such was the case here. D.J., therefore, did not cross the "line between filming the police . . . and hindering the police," *Buehler*, 27 F.4th at 976, and was engaged in a clearly established, constitutionally protected activity on his family's private property.

We also agree that D.J. has substantiated a requisite injury. That element "requires some showing that the plaintiff's exercise of free speech has been curtailed." *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017) (quoting *Kennan*, 290 F.3d at 258)). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Id.* at 697 (quoting *Kennan*, 290 F.3d at 259).

The district court found that D.J. suffered an injury when Moring pointed his taser at D.J. and verbally threatened him. To be clear, Moring was justified in securing the perimeter. However, Moring also verbally taunted and shoved D.J. And Moring admitted in his deposition that he intentionally moved from side to side to block D.J. from recording the arrest, not to control the perimeter or respond to D.J.'s interference. Moring's actions, coupled with the threat of the taser and Moring's admission, could lead a reasonable jury to find that D.J's speech was chilled and that Moring's actions were "substantially motivated against [D.J.'s] exercise" of his First Amendment right. The district court therefore did not err by denying Deputy Moring summary judgment as to D.J.'s First Amendment claim.

## IV.

To sum up: The district court erred in denying summary judgment for the Deputies as to Perkins's excessive force claim. The video evidence

No. 22-30456

conclusively demonstrates that neither Deputy employed excessive force to subdue Perkins, who just as conclusively was resisting arrest.

D.J.'s excessive force claim fails because there was simply no seizure from which such a claim could stem. But we agree with the district court that D.J.'s filming of the arrest was a clearly established, constitutionally protected activity that overcomes Moring's qualified immunity defense at this stage of the proceedings.

Accordingly, we DISMISS this appeal in part, REVERSE and RENDER in part, and REMAND for further proceedings consistent with this opinion.

No. 22-30456

JAMES C. HO, *Circuit Judge*, dissenting in part:

Citizens have an established constitutional right to record police interactions with members of the public, under our circuit precedent. *See Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017).

But this case does not present a violation of that right. To begin with, the available video evidence confirms that Officer Ryan Moring did not once ask D.J. to cease filming. Nor does it show Officer Moring otherwise trying to prevent D.J. from recording his mother's arrest.

To the contrary, it shows that Officer Moring was simply trying to establish a reasonable perimeter so that his fellow officer could safely detain D.J.'s mother, who was behaving in a hostile, abusive, and insulting manner toward the officers. *See id.* at 688 ("[A] First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions."). Specifically, the video shows D.J. shouting at the officers while Perkins is just a few feet away actively resisting the officers' attempts to pacify her. So Moring understandably asks D.J. to back up. Yet despite Moring's repeated requests to back up and avoid interfering with their work, D.J. refuses. Instead, D.J. repeatedly, and with increasing intensity, shouts that he refuses to move. A safe distance is eventually established, at which time Moring stops standing between D.J. and Perkins.

In addition, Officer Moring's affidavit states that, far from trying to interfere with anyone's right to record, he specifically affirmed that D.J. could "film from the porch of the residence." **Moring Aff. 6 at ¶28**.

The Constitution does not compel police officers to affirmatively help a citizen secure the ideal camera angle while that citizen is actively berating the police just a few feet away from an active physical struggle with another person. I dissent in part.